THE PEOPLE'S ICE COMPANY v. THE STEAMER "EXCEL-
SIOR."

*Navigation—Riparian rights—Wanton destruction of ice-fields.*

Highways whether by land or water must be used with due regard to their lawful and proper use by others.

The right of navigation, though paramount, is not exclusive, and cannot be so exercised as to wantonly destroy private rights or property that can be enjoyed consistently with it; such as the rights to maintain ice fields or stake-nets, or to run logs, or establish boom limits and dock lines.

A lessee of riparian rights may enclose and store ice for his own use and profit, within the limits embraced in his lease, if he does not thereby interfere with the right of navigation, or with the proper use of the stream by other people.

A steamer was run back and forth unnecessarily near a boom enclosing a field of ice that was to be stored for the market, and the ice field was thereby destroyed. *Held,* that an action for damages would lie therefor.

The measure of damages for the wanton destruction of immature property, such as a field of forming ice, is the value of so much as would probably have been saved for market, less the expense of storing it.

Where an action for damages for the destruction of immature property is brought when the full extent of the injury can be estimated with reasonable correctness in view of the uncertainty whether it would ever have reached maturity, *it seems* that damages may be estimated accordingly and need not be confined to the actual loss at the time the property was destroyed.

Appeal from Wayne.    Submitted June 8.    Decided October 6.

PROCEEDINGS under the Boat and Vessel Law.    Both parties appeal.    Damages increased.

*George H. Lothrop* and *George V. N. Lothrop* for complainant.    There may be property rights in water subject only to the right of navigation : *McCready v. Virginia* 94 U. S. 395 ; the claim that a riparian owner has no rights beyond

the water line: (*R. R. Co. v. Schurmeir* 7 Wal. 272; *Atlee v. Packet Co.* 21 Wal. 389), does not prevail in Michigan: *Lorman v. Benson* 8 Mich. 18; *Rice v. Ruddiman* 10 Mich. 125; *Brig City of Erie v. Canfield* 27 Mich. 480; ice becomes property by becoming stationary on the freehold: *State v. Pottmyer* 33 Ind. 402; and in Michigan it is personal property: *Higgins v. Kusterer* 41 Mich. 318; torts upon waters utilized by riparian owners become local trespasses: *The Plymouth* 3 Wal. 33; *Rock Island Bridge Case* 6 Wal. 213; *The Ottawa* Brown's Adm. R. 356; *Neil Cochran* id. 163; damages should be adequate compensation for the injury: *Allison v. Chandler* 11 Mich. 542; *Warren v. Cole* 15 Mich. 265; *Gilbert v. Kennedy* 22 Mich. 129; *Clark v. Lake St. Clair Ice Co.* 24 Mich. 508; *Winchester v. Craig* 33 Mich. 210; but loss of time, profits and business have been allowed for, where they were caused by the injury, especially in cases of tort: *Freeman v. Clute* 3 Barb. 424; *Davis v. Talcott* 14 Barb. 611; the natural and probable consequences of the injury should be taken into the account: *Lincoln v. S. & S. Ry. Co.* 23 Wend. 425; *Holyoke v. G. T. R. R.* 48 N. H. 541; the damages for willful conversion of the ice would be its value less the cost of putting it up: *Final v. Backus* 18 Mich. 232.

*Wisner & Speed* for respondent.

MARSTON, C. J. Some of the questions raised in this case are not only interesting, but of such importance as to demand great care in their examination and in the discussion and disposition thereof.

The following statement of the case is taken from the briefs of counsel for the respective parties: In January, 1878, the complainant was an ice company·in Detroit doing a general ice business, and was lessee of a portion of Belle Isle in the Detroit river, consisting chiefly of water front. The respondent steamer was a ferry boat used and employed in ferrying between Windsor and Detroit. Occasionally she was used for towing upon the Detroit river and adjacent

waters.   On the leased property, running along inside of the channel bank of the Detroit river, the complainant had constructed a boom 3600 feet long, containing 1,099,600 square feet, outside of a line fifteen feet from the shore.

On the shore, adjacent to this pond, complainant had fifteen ice houses, capable of holding about twenty thousand tons of ice.   On January 11th, 1878, this pond was frozen over with hard, clear ice, six inches thick.   On that day the Detroit river was entirely open, and the steamer was taken by her master from her dock below Belle Isle up beyond, then turned and run down part way, thence up, then down, up again, then down to Detroit.   Complainant claimed that the steamer was run on these trips unusually near the boom, and that the swell caused by the steamer broke up the ice in the boom so that complainant was unable to harvest it.   The width of the channel of the Detroit river opposite this boom, was upwards of eighteen hundred feet.   This was the first crop of ice that had formed that winter, and the weather thereafter was so mild that no more ice fit to cut formed in the boom ; consequently complainant failed to get a stock to fill its ice houses.

The case was heard in the court below without a jury, and judgment was rendered in favor of complainant for one thousand dollars damages.   Both parties appealed.

The complainant appealed because the amount awarded was considered inadequate.   The defendant presents several objections in this court : that the amount of the decree is larger than the evidence warranted ; that the mildness of the winter of 1877–8 was the proximate cause of any injury suffered by complainant, and that the respondent is not liable for such an injury ; that the court should have adopted as the correct rule of damages "the true value of the ice, or rather the privilege of taking it—what it would have been shown to be had the matter been settled or the case tried on the very day the ice was broken"; that conceding the respondent to be liable, which was not done, the value is to be determined as on the day the ice was broken, and upon the probabilities, based upon the ordinary course of events,

relating to such matters. It being alleged that the steamer did not keep in the channel of the river and away from the boom—which if she had done no damage would have been done the ice—the respondent, in answer thereto, claims that the right to navigate any portion of Detroit river, between its banks, is not subject to the rights of parties having property along the shore that may be injured by the swell occasioned by passing steamers, and that no such burthen can be attached to the right of navigation. The respondent farther claims that if the only object the master had in going up the river was to break the ice, he in so doing was acting entirely beyond the scope of his employment, for which neither the vessels nor the owner would be liable. It was also claimed that the steamer, having been bonded and released under the statute, a decree against the vessel was unwarranted. This complainant's counsel conceded, so no farther notice thereof need be taken.

There was very great difference in the opinion of witnesses as to the value of the ice. Complainant's witnesses, in view of the season and subsequent scarcity of ice, valued it at two dollars per ton; some, indeed, still higher. The quantity was fixed at about thirteen thousand tons. The defendant's witnesses, some of them, say that on January 11th, the time of the injury, the ice had no value, as it was not fit to cut; that six-inch ice could not profitably be cut, and that it was early in the season, when ice in its place might be expected to form. Others placed a value on the entire crop of from three to seven hundred dollars. That the ice was broken and destroyed for complainant's use by the swells caused by the steamer, we have no doubt; and owing to the width of the channel this could have been avoided without delay, danger or additional expense to the steamer. If we accept the evidence of the master as true, that his business in going up the river the first time was to ascertain the condition of the ice in Lake St. Clair in order to determine whether he could, with safety, on the next day go after and tow through a vessel; that in going up the second time he desired to ascertain whether the American channel was open, having omitted

so to do on the first trip; and that the occasion of his third trip up was that he might cross over and enable a party on board, who was interested in the ice business, to see whether there was ice in a bay across the channel—it would not avail the defendant. It would still appear that the injury was done through gross carelessness, while the steamer was otherwise lawfully engaged.

Was then the respondent's right to navigate the Detroit river subject to complainant's right of property in this case? Ordinarily it may be said that the entire width of the highway may be used, yet the owner of the land over which it passes may, within the limits thereof, plant trees, set posts and do such other acts as will add to his convenience or assist in beautifying his premises. He is encouraged in doing this by public sentiment; in the remission of taxes by the public authorities, for the planting of trees; and in the protection which the law gives him by the punishment of those who interfere with or destroy what he has done. Public convenience may in time in particular locations require the removal of some of these things, and whenever the necessity arises and the public authorities request their removal, then the private must give way to the public or paramount right. But while permitted to remain, no one traveling the high-way could wilfully injure or destroy them, and should any one do so he would justly be held responsible notwithstanding his plea of a claim of right to travel over any part of the highway. If the law were otherwise, the streets in our cities and villages, and our public highways, would soon be stripped of their shade and ornament. *Clark v. Dasso* 34 Mich. 86.

So in cities the right to use the public streets whereon to deposit materials for building purposes is frequently granted and enjoyed. Has the traveler the right unnecessarily to wilfully or negligently drive over and break, mar or destroy such materials upon the plea of a right to use the highway? The law in this country requires the owners of vehicles, when meeting, each to bear to the right, yet it has never been supposed that a neglect so to do on the

part of one would justify the other in wilfully or carelessly injuring the person thus in the wrong. A teamster may temporarily encumber a part of the highway while loading or unloading; and while thus exercising his right, another cannot insist upon occupying the same place, or carelessly drive into and injure his team or vehicle. *Cary v. Daniels* 8 Met. 478; *Daniels v. Clegg* 28 Mich. 32.

The right of fishing in our public navigable waters is one largely and profitably enjoyed, and in order to carry on the business successfully it frequently becomes necessary to set nets extending into the river channels and the deep navigable waters of our lakes. This may, and to a limited extent does, cause vessels to change their course in order that the property of the fishermen may not be injured or destroyed. The master of the vessel would not be justified if he should unnecessarily or wantonly run his vessel upon the nets and destroy them. *Post v. Munn* 1 South. (N. J.) 61.

So in the rafting, running and towing of logs in our navigable waters, vessels are sometimes necessarily delayed or caused to change their course; yet in cases where the owners of the logs were exercising due care and reasonable diligence, the vessel must suffer the temporary delay or inconvenience caused. So in establishing dock lines and boom limits on our rivers and lakes, the channel is frequently encroached upon in order to reach deep water, that the right may be useful and valuable; and although the channel may thereby be narrowed, yet if ample room for the purposes of navigation remains, the owners of vessels cannot complain. Of course the right of navigation is paramount and no unreasonable or unnecessary obstruction can be permitted to interfere therewith; but while this is so, yet the riparian proprietor and the public do not thereby lose all right to use the stream for any other and legitimate purpose which will not unreasonably interfere with the right of navigation. The right of navigation, while paramount, is not exclusive, and cannot be exercised to the unnecessary or wanton destruction of private rights or property, where both can be freely and fairly enjoyed.

But in this case the vessel did not run into the boom, and therefore it may be said the case is not parallel with those we have been considering. The principle however is the same, which recognizes the superior right of the vessel, but punishes any abuse of that right. It is also clearly apparent that vessels have not an exclusive right to use the entire channel, which may be narrowed or used for purposes, some of which are but remotely if at all connected with the subject of navigation. It is well known, as this case proves, that there is a class of vessels navigating our lakes and rivers which cause, when running, very great commotion or swells in the water. It is also well known that on many of the rivers a class of lighters and barges are used for the lighterage or necessary transportation of the agricultural, manufacturing and mining products of the country. This class of vessels are often loaded to the water's edge, and in smooth waters are thus considered perfectly safe, and yet they could not venture out where the winds or waves could reach them. Would a steamer approaching such a tow, where it was clearly apparent the swell she created would endanger the lighter or cargo, be justified in recklessly pursuing her course at full speed, in case damage resulted? Upon some of our rivers and water highways artificial banks have been formed for the benefit of commerce, and to prevent a spread of the waters over the adjoining country. The swells caused by steamers of a certain class would, by washing such banks, and otherwise, weaken and injure them, and thus create danger of public and private damage. Such dangers are frequently guarded against by legislation or rules of the highway, but it may be questionable whether such regulations are not merely declaratory of the common law maxim that a man must enjoy his own property in such a manner as not to injure that of another person. So the right to boom logs is necessary to their profitable manufacture. The owners must therefore be protected in this right, else it would be of but little value. Vessels would have no right to destroy them, or wantonly run so close to them as to cause a loss of the property therein. A vessel has no right to wantonly run so close

to the shore, to a boom or to a dock as to cause damage which could easily be avoided by standing farther off.

In the case at bar the complainant had a right, under its lease, to enjoy the ice in its boom, and store it for use and profit. *Lorman v. Benson* 8 Mich. 18. The owners of the defendant boat had a right to navigate the Detroit river, but in doing this they were morally and legally bound to do no wanton injury to the property of others. It was clear to all that the agitation of the water caused by the boat was breaking and destroying the ice, and it was well known to those in charge that there was abundant room for the vessel to proceed on her course without deviation or delay, and at such a distance from complainant's boom that no injury whatever would have been done. For such an injury we are of opinion the vessel should be held liable.

" Though a man do a lawful thing, yet, if any damage thereby befalls another, he shall be answerable if he could have avoided it." The maxim *Sic utere etc.*—" So use your own property as not to injure the rights of another,"—is of very general application in cases of conflicting interests, and, it has been observed, will " generally serve as a clue to the labyrinth in such cases." Broom's Legal Maxims, 357 *et seq.*

As to the measure of damages. Defendant's position, if correct, must be of general application. Let us test it. Suppose a person goes upon the lands of his neighbor and wilfully destroys his growing crops while immature, what should be the measure of damages?—the value of the crop in its then condition? If so, what would be the value of a crop of potatoes when the tubers were just forming? of a crop of apples where the tree was destroyed while in full blossom? of a crop of corn when commencing to tassel, or of wheat where the heads were forming? In the two first there would be no value whatever, and in the second for fodder only. Would the value in each case at the time of the injury be the measure of damages? or would the injured party be permitted to show what the matured crop, in all probability, would have been, for the purpose of recovering the damages he had sustained? If the value at the time of the injury

only could be recovered, a way would thus be pointed out for parties to be avenged of their adversaries with impunity.

In the opinion of some of the witnesses six-inch ice was of but little if any value, owing to the difficulty of cutting and storing ice of that thickness; and some were of opinion that ice less than six inches had no present market value. If so, and the then value would be the measure of damages, then an ice company could with safety destroy the ice of its rivals, if only done at a time when the ice was not of sufficient thickness to cut and store. A daily breaking up of the ice would accomplish the desired result without danger of excessive damages or of any considerable liability. Such a rule would simply be one of gross injustice, and it is only necessary to thus carry out the position taken by counsel to show the injustice thereof.

The owner of the growing crops would not be limited in his recovery to the value thereof at the time of their destruction, nor to the fair rental value of the lands. If the action were brought at once, and a trial had, the prospective yield and value of the crop when matured might be shown. The proof might be unsatisfactory and uncertain, and largely a matter of opinion. Such considerations should not, however, absolve the wrong-doer, and the dangers, if any, from such a rule, he should incur. If such an action were not commenced or tried until after the time when such crops would have matured, the same elements of uncertainty would not exist. It would then be known whether the season had been a favorable or an unfavorable one; the yield per acre in that vicinity; the market price of the crop; the expense—all could be ascertained with tolerable certainty, and why should the law exclude such proofs? The law affords abundant instances of cases analogous to the present, where the extent of the injury cannot be ascertained immediately thereafter, and where evidence is permitted to be given to show the probable extent thereof, or if sufficient time has intervened before the trial, to show the actual result. In all such cases the extent of the injury can be ascertained with reasonable certainty.

It is said however that this is permitting the damages to be enhanced by particular seasons and circumstances over which the wrong-doer had no control, to which he in no way contributed and could not have anticipated. What the anticipations of the wrong-doer may be is important only when exemplary damages are demanded ; the law measures the damages in other cases regardless of intentions. But why should not exceptionally favorable or unfavorable seasons be considered in this class of torts ? In the ordinary case of the breach of contract the contractor may show that the season turned out a favorable one, and the effect thereof upon the profits he would have made. *Burrell v. New York etc. Salt Co.* 14 Mich. 38. So where there has been a breach of a contract, and the party not in fault has had to proceed and employ others in an action to recover the damages sustained he may show an advance in the price of materials and labor after the breach. So if a person should let his farm to another on shares, or his mill for the season for a portion of the profits, why should he not be permitted to prove, in view of the season, what his probable share of the crops would have been on his proportion of the profits of the mill had the contract been fully performed ? Why should not the favorable or unfavorable season enter into the question ? All look to the favorable times and seasons to make their profits, and to recover back the losses they sustained during the unfavorable ones, and it is not for the wrong-doer to say they shall not.

It is undoubtedly true that there are exceptions and limitations to be considered. Thus, for the breach of a contract, extraordinary or uncontemplated contingencies are considered as too remote to affect the damages. *Clark v. Moore* 3 Mich. 55 ; *Michigan Central R. R. Co. v. Burrows* 33 Mich. 6. Even in the case of a wrong-doer he may take or destroy personal property of a certain kind, such as live stock, which gave promise of, and in time might have been, of great value, but which, because of its immaturity, was of but little value comparatively. The future would be altogether too uncertain and dependent upon too many contin-

gencies to base any estimate or make any calculation thereon. The expense attending its growth, the risk of accidents or death, and the utter uncertainty of its development and value consequent thereon, necessitate an adherence to its value at the time of the wrong done. Even in such a case there are surrounding circumstances in the past history and present promise of the property which may be taken into account and fix the value far above what it otherwise would be.

It is somewhat difficult to say in which class this case belongs, or to lay down any distinct rule that should govern in all such cases. There are uncertainties surrounding a case like the present which should not be overlooked: Would all the ice in this boom, estimated at 13,000 tons, have been gathered and safely stored had not the injury been done? The question is not what could possibly have been done had the ice not been broken, and complainant, on the morning of that day, known that it must save that ice or obtain none that season. Such knowledge would undoubtedly have caused an extra effort to be made, and perhaps saved all of it; but in the absence thereof, and in view of the weather that might at such a season reasonably have been anticipated, would complainants have made such effort? They say they would—this, of course, in view of what afterwards took place—but of this we are not certain. There is not the same reasonable certainty in this case that the crop would be harvested that exists in reference to other crops. The condition of the weather would more easily affect a crop of ice. Would the complainants, in hopes of more favorable weather and better ice, have waited and thus lost the whole or the greater part thereof? These are proper questions to be considered; and although, in the light of what followed, complainants say they intended to and would have put on an extra force, and thus have saved it, yet it is not clear to our minds that they would have done so.

These are risks attending the business and which the complainants must have run even had the ice been uninjured by the boat, and for such risks the defendants should not be held responsible. In other words, while the short crop and scar-

city of ice the ensuing season, and value consequent thereon, should be considered in placing a value upon the ice destroyed, yet this can only be done upon the basis that complainants would have saved that ice, and for so much of it as they would in all probability have saved they should recover the full value, less the cost and expense of harvesting it. The defendants, while justly responsible to this extent, yet should not be held as insurers of its safe storage, as this was a risk the complainant, in any event, must have run. There is evidence in the case that ice under somewhat similar conditions. about that time, owing to the unfavorable weather, was almost wholly lost.

In view therefore of all the circumstances of this case, of the preparations made by the plaintiff before the injury to harvest this ice, the weather thereafter and the uncertainty of gathering and storing it, of the season following and the price of ice, we are of opinion that the complainant should recover two thousand and five hundred dollars damages and costs.

The other Justices concurred. ·