BISHOP v. BALDWIN.

1. SHIPPING—LIABILITY FOR TORTS—FISH NETS—RIGHT TO FISH.
     In an action by the owner of fish nets, set in St. Mary's river,
     against the owners of a tug and rafts for injury to the nets by
     running over them, a claim by defendants that plaintiff had
     no right to fish in that place because fishing with nets is pro-
     hibited by section 5865, 2 Comp. Laws, except in certain
     rivers, the Sault Ste. Marie, but not St. Mary's river, being one
     of them, is immaterial, there being no doubt of the legislative
     intention, and it not appearing that defendants or their nav-
     igating officer knew of the alleged misnomer or supposed it to
     be unlawful to use nets in such waters.

2. SAME—TRESPASSERS.
     Whether, as between himself and the owner of the shore, plain-
     tiff was a trespasser is also immaterial.

3. NAVIGABLE WATERS — RIGHT TO NAVIGATE — RIGHT TO FISH—
     CONFLICT.
     The right of navigating the waters of the Great Lakes, though
     paramount, is not exclusive, and gives the owner of shipping
     no immunity from liability for negligent or wanton injury to
     fish nets placed in such waters.

4. SHIPPING—INJURY TO FISH NETS—EVIDENCE—SUFFICIENCY.
     In an action against the owners of tugs and a raft for injury to
     fish nets by running over them, evidence examined, and held,
     sufficient to go to the jury on the question of defendants' neg-
     ligence.

5. SAME—LIABILITY OF VESSEL OWNER—CARE REQUIRED.
     Where fish nets were so placed that, if seen before closely ap-
     proached, no appreciable interruption of the voyage of de-
     fendants' vessel would have followed a change of course to
     avoid them, or, if they were not seen, but their presence was
     so obvious that ordinary care must have discovered them,
     defendants are liable for the injury caused by running them
     down.

Error to Chippewa; Steere, J. Submitted October 10,
1906. (Docket No. 32.) Decided January 4, 1907.

Case by Joseph Bishop against Cyrus W. Baldwin and

the Peninsula Bark & Lumber Company for damages to plaintiff's fishing nets. There was judgment for plaintiff, and defendants bring error. Reversed.

On July 27, 1905, and for some time previous thereto, plaintiff had two pound nets set in the waters off shore in Bay Mills township, Chippewa county. The river or bay at this point is about four miles wide. The channel bank begins at 22 feet of water. The current is southeast. The nets were set at right angles with the shore; the stakes nearest the shore being from 4½ to 5 rods distant, in 10 or 12 feet of water. The nets were attached to piles or stakes driven to considerable depth in the earth, extending from 3 to 5 feet above water. Each net had 50 rods of lead, the larger one a tunnel extending 50 feet farther into the water, and a pot 35 feet square and 60 feet deep. Each pot was protected by a framework around the top and above the water. In daylight, in clear weather, the position of these nets could be seen for one mile. Plaintiff was not the owner of the shore and had no riparian rights, though he had a license from one who had, in fact, no title to the shore. Both nets extended into the navigable channel, but were not in the course usually followed by steamboats navigating those waters. On the night of the day mentioned, defendants' tugboats, Charley O. Smith and Kate, were towing a raft in this river; the tug first named leading, and her master being in command of the expedition. The raft passed over a portion of the nets, and the plaintiff has recovered a judgment for the injuries sustained. There was no light on the nets, nor any bushes set up, as is sometimes done, to attract attention to their position. The tugs had their full complement of crews, were seaworthy, and were navigated by compass. So far as is above related, the facts are not in dispute. There is some dispute as to whether the night was clear, with starlight, or only reasonably fair, whether the raft took the same course as on previous earlier occasions, and as to the velocity of the wind.

It is not contended that the vessels were driven by stress of weather into collision with the nets. It is denied that the agents of defendants saw the nets. On his cross-examination, the officer who had charge of the tugs, and was on the leading tug at the time the fish nets were passed, testified in substance that, while the course which he found set for him when he took command at 12 o'clock would have taken him about a half a mile from the shore at the point where these nets were set, he changed the course for the purpose of keeping farther out, the wind being southeast; that, in passing the point where the nets were set, the course he set for himself would have carried him farther out than the one he found set for him when he took command; that he did not notice that the wind was driving him towards shore; that, when opposite the place where the nets were set, he must have been more than a quarter of a mile from shore; that he examined the shore with his glass, and the river down shore between the banks with the glass, and the water in front of him; that he could not see, in a night of that character, a spar buoy with his glass over 200 feet away; that the watchman was aft somewhere at the time plaintiff's nets were passed; that he did not go through the fish nets to his knowledge, and did not see any fish nets; that the tow line was from 600 to 800 feet long, hitched to the middle of the raft, which was about 400 or 500 feet wide, and his (the leading) tug was 150 feet in advance of the other tug. He himself was at the time acting as wheelsman and in a position to see visible obstructions of his course. His testimony to the effect that he examined the course, shore, and water with his glass, that he saw no fish nets, and did not know that a collision with the nets had occurred, is undisputed by other testimony.

It is averred in the declaration of the plaintiff that the nets were situated less than one mile from shore in that part of Lake Superior known as "White Fish Bay," in said county, and so set as not to hinder or prevent navigation in said waters. Defendants gave notice, with their

plea, that they would insist in their defense that plaintiff had no lawful right to have his nets in the place in which they were, and that they were there in violation of the law of this State and of the United States; that the nets were so placed and set as to impede and obstruct navigation, and that they (defendants) had a paramount right, with steamboats licensed by the United States, to navigate said waters freely; that plaintiff's right to fish in said waters was subordinate to the right of defendants to navigate them; that any and all statutes of the State of Michigan purporting to grant or give to plaintiff the right to fish in said waters with his said nets were of no force or effect, because in conflict with the superior right to navigate said waters with steamboats; that the said steamboats of defendants were duly enrolled and licensed by the United States to navigate said waters and to tow said raft, and that at the time and place set out in the declaration they had the paramount right in said waters; that the waters of the Great Lakes for a distance of one mile from shore are subject to unobstructed and free navigation, unaffected by local or State laws, the acts of Congress respecting navigation governing to the exclusion of other laws; that plaintiff took no care to properly warn passing vessels of the presence and position of said nets.

The learned trial judge submitted the case to the jury upon the theory that plaintiff had the right to fish in the waters where his nets were set; that defendants had the right to navigate those waters; that the right of navigation was paramount to all other uses of the water; that the issue to be determined by the jury, apart from the question of the damages sustained, was whether or not the defendants, in view of all conditions, navigated the waters upon the occasion in question negligently, whether as a result of such negligent navigation the alleged injury occurred, and whether the failure of the plaintiff to light or otherwise better mark the position of his nets contributed to the injury. One special question was submitted to the jury, which was:

"Did the conduct or failure on the night in question of the plaintiff, Bishop, to give warning by light or otherwise of the location of his nets, contribute to the injury ? "

This question the jury answered, "No."

*E. S. B. Sutton,* for appellants.

*M. M. Larmonth* (*Warner & Sullivan,* of counsel), for appellee.

OSTRANDER, J. (*after stating the facts*). Counsel for appellants contends that plaintiff had no right to fish with these nets in the waters in which they were placed. The ground of this contention is:

1. That the nets were in the waters of St. Mary's river and not in those of White Fish Bay; that 2 Comp. Laws, § 5865, makes it unlawful for any person to catch fish at any time with pound nets in any waters of the State, excepting those specified in the statute; and that St. Mary's river is not specified.

2. That St. Mary's river is a national highway of commerce, and the State can pass no effective law permitting interference with commerce, and that the setting of nets obstructs navigation.

The statute names the Sault Ste. Marie, St. Clair, Saginaw, and Detroit rivers. It is said there is no Sault Ste. Marie river, and that the court may not assume that the legislature meant to designate these waters by the name Sault Ste. Marie. We are referred to the Webster-Ashburton treaty, to various public documents, and to our own decision in *Sherwood* v. *Commissioner of State Land Office,* 113 Mich. 227, in which, uniformly, the designation is " St. Mary's." We are not favored with inspection of a certain marine map used in the trial court. There can be no doubt concerning the legislative intention, and it does not appear that defendants, or their navigating officer, knew about the alleged misnomer, or supposed it to be unlawful or unusual to use such nets in these waters. We agree with the circuit judge that, for the purposes of this case, it is immaterial what name is

given to the waters in which the nets were placed, or whether, as between himself and the owner of the shore, plaintiff was a trespasser.

No question of conflict of State and Federal jurisdiction over waters or over the subject of navigation is presented. The theory of the plaintiff's case and of the charge of the court is that the right of navigation in the waters where the nets were set is paramount to the right to fish. The real question presented is much narrower than the one counsel for appellants has argued. That defendants were exercising a paramount right does not necessarily excuse them. It was well said by Mr. Justice Lyon, in *Wright* v. *Mulvaney*, 78 Wis. 89 (9 L. R. A. 807):

"The benefit which the navigator is entitled to claim by reason of his paramount right is, we apprehend, that, when the two rights necessarily conflict, the inferior must yield to the superior right."

This court long ago asserted that the right of navigation in such waters, though paramount, was not exclusive. *People's Ice Co.* v. *The Steamer Excelsior*, 44 Mich. 229. See, also, *Lincoln* v. *Davis*, 53 Mich. 375; *Hopkins* v. *Railroad Co.*, 131 N. C. 463. Plaintiff complains of the violation of a common-law right, and seeks a common-law remedy. We confine ourselves, therefore, to an examination of the errors relied upon in the brief of counsel for appellants, arising upon the trial, affecting the result of the trial.

It is not claimed there was testimony improperly received or rejected. It is asserted that in charging and in refusing to charge the jury error was committed. The serious complaint, and the only one, perhaps, which we need to notice, is of the rule laid down by the court respecting the care demanded in the navigation of the boats to discover and to avoid collision with the plaintiff's nets. For a proper understanding of the criticism made, it is necessary to set out various portions of the charge. In defining to the jury the rights of the parties, the court said:

"And if those nets are so set that by mere changing of the course the vessels can safely navigate on their way, then they are lawfully there. The master of a vessel would not be justified, in cases of that kind, if he carelessly, unnecessarily, or wantonly ran his vessel upon such nets and destroyed them. Now, vessels having a paramount right of navigation can lawfully run upon any course in these waters. They can run to all ports and any direction, and to any place. They can run far from shore, or close to shore, or straight along the shore in a varying course; but in doing so they are required to observe the rules of navigation. It is the duty of masters to operate their boats with care and caution, to watch for other vessels and other obstructions, and to avoid them when possible. If it should appear in this case that these vessels, with rafts, were running closer to shore than the parties navigating them proposed, they still had a right to do so; but it was their duty to watch and discover these nets or any obstruction in the way, and avoid them, if possible to do so, by exercising ordinary diligence. * * *

"So far as the testimony in this case stands, it shows that these boats were properly equipped and properly manned, and, as I said before, they had a right to pass as near the shore as they were shown to have passed; but in doing so they must have due regard for the conditions surrounding them, and it was their duty, if it was a well-known fact that fish nets were along that shore, to exercise greater care and caution according to the conditions to their knowledge upon that subject. * * *

"Briefly stated, the rule is this: That it was the duty of those navigating these tugs and towing that raft to do so with caution, to exercise all care and diligence possible to observe these nets or any other obstruction. If they exercised that care and caution, under the conditions, the time of day, and the condition of the weather, they would not be liable in this case. If they did not, and were careless or negligent, then they are liable.

"Taking up that proposition again, and giving it in the language of a request, which we have [one of defendants' requests to charge], you are instructed that the plaintiff had a common right to fish in the waters in question, in common with others, subject to the paramount right of navigation, and also these tugs and rafts had a common right to navigate those waters in question in common with other craft;

and if any injury was done to plaintiff's nets by said tugs or rafts, or either of them, as alleged, you are instructed that if you find the defendants' tugs and rafts used the said waters in question and navigated their said tugs, respectively, and towed said rafts, in a prudent, seamanlike, reasonable, and cautious manner, at the time of said injury, they were in the lawful exercise and use of a common right, and a lawful right, possessed by each of said defendants, and for which there could be no recovery by this plaintiff, even though damage was done."

It is conceded by counsel for appellants that, even if the nets were unlawfully in these waters, defendants would have no right to wantonly run into them, and would be required to use ordinary care to avoid them, and claimed that, whether the nets were legally or illegally in the waters, the jury under this charge were permitted to apply a rule concerning the care required which was unwarranted. The argument made by counsel for the plaintiff is that, taking all the testimony into consideration, the jury were justified in finding that the night was clear starlight. That the tugs were carelessly and negligently managed is conclusively shown by the fact that, although claiming to steer by compass and to have determined to sail a course at least a half a mile from shore, followed by a change of course which would have brought the boats a mile and more from shore at the point at which these nets were set, the flotilla actually passed within a quarter of a mile of the shore, indicating that those in charge were asleep, or paying no attention to the course which they were taking, and maintaining no lookout whatever. In our opinion, the testimony made a case upon which plaintiff was entitled to take the verdict of the jury, and it is not clear that, if the court had given the jury the most modified rule respecting the care which defendants' officers were bound to exercise, the verdict, in view of the testimony, would have been different.

But we are also of opinion that the court laid down a rule concerning the duty of the defendants not warranted and not supported by authority, which rule the jury were

at liberty to apply. The most favorable rule to which the plaintiff here is entitled is based upon the principle, stated in *Wright* v. *Mulvaney*, supra, that the master of the vessel may not, unnecessarily, by his own negligence, force the two rights into conflict, and then claim the benefit of the paramount right. The testimony in this case is, and no other conclusion is warranted, that, if the nets had been seen before they were closely approached, no appreciable interruption of the voyage would have followed a change of the course to avoid them. If, therefore, they were so seen, defendants should be held liable. If they were not seen, but their presence was so obvious that the person or persons charged with navigating the fleet, if performing with ordinary care the duties of the position, must have seen them, then it was negligence not to see them, and defendants should be held liable. These views are supported by the reasoning of our own and other decisions already cited, and are not opposed to those expressed in *Lewis* v. *Keeling*, 46 N. C. 299; *The City of Baltimore*, 5 Ben. (U. S.) 474; *Cobb* v. *Bennett*, 75 Pa. 326; *Post* v. *Munn*, 4 N. J. Law, 61; Gould on Waters, § 87.

As a new trial must be awarded, discussion may properly end here. The judgment is reversed, and a new trial granted.

GRANT, BLAIR, MONTGOMERY, and HOOKER, JJ., concurred.