## THE ARMORICA.

(District Court, E. D. North Carolina. April 15, 1911.)

1. SHIPPING (§ 83*)—LIABILITIES OF VESSELS—INJURY TO FISH NETS.
    A vessel which unnecessarily and deliberately runs into and injures fish nets, set where they do not obstruct navigation, is liable in damages.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 336; Dec. Dig. § 83.*]

2. SHIPPING (§ 79*)—LIABILITIES OF VESSELS—INJURY TO FISH NETS.
    While the right of navigation and of fishing both exist in navigable waters, the right of navigation is paramount, and a steamer having a raft of logs in tow, proceeding from one point to another on the shore of Albemarle Sound in stormy weather, which rendered it unsafe for her to take her raft far from shore, in the absence of wantonness or malice, is not liable for an injury to fishing nets which were set extending two miles from shore and across the steamer's proper course.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 333-348; Dec. Dig. § 79.*]

In Admiralty. Libel by J. L. Pritchard against the steamer Armorica. Decree for respondent.

Roscoe Turner and W. A. Worth, for libelant.

W. L. Cahoon, E. F. Aydlett, C. E. Thompson, and R. T. Thorp, for libelee.

CONNOR, District Judge. Libelant filed his libel in this court on May 30, 1910, alleging that on February 25, 1910, his nets were set for the purpose of catching fish in the waters of Albemarle Sound in the Eastern District of North Carolina, in a plain, conspicuous place, not obstructing navigation, and being operated under the superintendence and care of competent persons; that on said day the steamer Armorica carelessly, negligently, and without cause ran into said nets and damaged them; that said act was "negligently and unnecessarily

done, that there was abundance of room for said steamer to pass said nets without injury to them, without hindrance or delay, but that she deliberately and carelessly ran into said nets and destroyed them." Libelee moved the court to dismiss the libel for that upon the allegations in the libel the steamer was not liable, etc. This motion is denied.

[1] Certainly if the steamer unnecessarily and deliberately ran into the nets when she had ample room to pass them without hindrance or delay—that they were not obstructing navigation—such conduct would be wanton and willful, severely approximating malice, and for this there can be no question that she is liable for the damage done to the nets. Libelee answered, denying the material allegations of the libel, and for further defense alleged that:

"The said steamer was a steam tug of 30 tons and of 6½ feet draught; that she can ply only in the navigable waters of the United States, and has never, at any time, plied in any other waters of Albemarle Sound than such as are public, navigable waters; that, under the laws of the United States, fishing nets and seines placed in public, navigable waters are necessarily obstructions to navigation," etc.

The case was referred to George J. Spence, Esq., commissioner, with direction to hear the testimony and report to the court his findings of fact. He reported:

(1) That libelant, J. L. Pritchard, on and prior to February 25, 1910, was the owner of certain nets located by him in the Albemarle Sound at a point between Little river and Pasquotank river known as Big Flatty creek. That said nets were being operated on said day and had been so operated for some time prior thereto.

(2) That said nets were placed at said point on Big Flatty creek, and "extended a distance of about two miles out in the Sound."

(3) That on and before said day W. M. Partridge was part owner of the steamer Armorica, and was on said day in command as master of said steamer.

(4) That on the morning of February 24, 1910, he was anchored near Lister's pier in Little river.

(5) That on the morning of February 25, 1910, at 2 o'clock, under the command of said W. M. Partridge, the said steamer "pulled out of the mouth of Little river and took a course for Pasquotank river."

(6) That between 9 and 11 o'clock on the morning of February 25, 1910, the said steamer, while on a course from Little river to Pasquotank river, ran into the nets belonging to libelant, damaging them to the amount of $100.

(7) That when the said W. M. Partridge "pulled out of Little river" on the morning of February 25th "the wind was blowing a gale—that the mouth of Little river, with a wind blowing a gale from the northwest, is a safe harbor."

(8) That said Partridge knew that the nets were placed in the Albemarle Sound at a point between Little river and Pasquotank river known as Big Flatty creek, and that said nets extended a distance of about two miles out into the Sound, and he knew that in sailing the course which he took from the mouth of Little river, and hugging the

northern shore of Albemarle Sound, he would necessarily come in contact with these nets.

The commissioner was of the opinion, and so reported, that upon these findings said W. M. Partridge ran into the nets "negligently, carelessly, and without cause." Libelee filed a number of exceptions to the findings of the commissioner. Since filing the report the commissioner has requested permission to change his finding in regard to the hour at which the steamer left her anchorage at Lister's pier and pulled out of Little river. There is a manifest error either in the hour fixed by the commissioner, 2 o'clock in the morning of February 25th, or in the hour fixed by the libelant's witnesses when the nets were run into. All of them say that it was between 9 and 11 o'clock, except one Maston, who says that it was 11 o'clock, that he examined his watch, and one W. A. Tillett says that it was between 8 and 12 o'clock. Capt. Partridge says that at 1 a. m. he ordered steam, and at 2 a. m. he pulled out of the mouth of Little river and steered southeast course for one mile, and then changed to east course, steered about five and a half miles, which placed him for Wade's Point at 7 a. m. He is sustained in this statement by the entries made in his log. Libelant introduces several witnesses who say that Capt. Partridge did not leave Little river before 7 a. m. It is clear that, if Capt. Partridge's testimony be correct, he could not have passed the nets at or near the hour fixed by libelant's witnesses. He says that he was not aware that he ran into any nets off Big Flatty creek. He fixes the hour of his arrival at Old Trap Wharf, and is corroborated in his statement at an hour which, considering the distance from Lister's pier, corresponds with his other statement. There is evidence that another steamer, the Gazelle, corresponding in appearance with the Armorica, was in these waters on the morning of February 25th. It is possible that the witnesses mistook her for the Armorica. The evidence in respect to the Gazelle being there is also contradictory. It is impossible to reconcile the testimony. Some one is wrong, either in memory or otherwise. Considering the distance from which the witnesses saw a steamer run into the nets, the condition of the weather, and their uncertainty as to time, in the light of Capt. Partridge's testimony and proof of his good character, I am of the opinion that libelant has not successfully carried the burden of proof and established his allegation that the Armorica ran into the nets.

[2] In view of the contention made by libelant, in respect to the rule of liability upon persons navigating the waters of Albemarle Sound when seines and nets are injured and the large public interests involved, I am of the opinion that the law should be declared to the end that persons exercising the right of navigation and fishing may control their conduct accordingly. Assuming, therefore, that at the time named by libelant's witnesses the steamer Armorica, in passing from the mouth of Little river to Pasquotank river ran into the nets under the circumstances insisted upon by libelant, or sustained by the weight of the evidence, the case comes to this: Libelant's nets were placed in the Sound for the purpose of catching fish. They extended out from the shore two miles. They were properly placed. It is

immaterial whether lights were upon them. The steamer Armorica, with a raft in tow, was on the morning of February 25, 1910, in the mouth of Little river and a due course in towing the raft took her from the mouth of the river to the mouth of Pasquotank river, between which points the nets were set. It is immaterial whether prudence for her safety required that she should remain in Little river. That was a question to be decided by her captain. The presence of the nets was not a factor in the decision of that question. He was as a matter of right entitled to make his trip by the safest route and course consistent with prudent navigation. When he left the mouth of Little river, he took his bearings from Reed's Point light to Wade's Point light. These were the proper points for him to take. He knew that in going from Reed's Point light to Wade's Point light he would pass through the waters in which the nets were set and pass over them. He knew that, in the condition of the weather, the course and velocity of the wind, safety for his boat and the raft required that he should hug the shore and not go out into the Sound. These conditions are shown by the testimony. In taking the course, under the circumstances, was he exercising his right of navigation; and is he liable for the injury sustained by the nets in doing so? The answer to this question depends on a few simple and well-settled principles. The right of navigation and of fishing both exist in the public without regard to any riparian ownership. Grants of land bounded by navigable water do not carry any several right of fishing is well settled in a very able and exhaustive opinion by Ruffin, Chief Justice, in Collins v. Benbury, 25 N. C. 277, 38 Am. Dec. 722. The right of navigation being paramount to that of fishing in these public navigable waters, the usual rules prescribing the mutual rights and duties of the public in using the state's highways do not prevail. The latter must give way to the former, as said by Pearson, C. J., in Lewis v. Keeling, 46 N. C. 299, 62 Am. Dec. 168. In this case the plaintiff had placed his nets in Albemarle Sound running out from the shore. Defendant for the purpose of bringing his boat to the shore, with knowledge of the placing of the nets, ran into and destroyed them. The court held that, in the absence of wantonness or malice, he was not liable to plaintiff. In his usual clear and direct manner of applying general principles to given facts, the Chief Justice says:

"Both rights exist, not as private rights, depending on grant or riparian ownership, but as rights in common, to which one citizen is entitled as well as another. The right of navigation is paramount, because it is of most importance to the public weal. The difficulty is to lay down a rule by which to allow the free and full exercise of this paramount right in such a way as to leave room for the other right to stand on, except as a matter of sufferance. * * * We have concluded that the line made by the law is a very broad one, and that, in fact the fishing interest has no ground on which to stand, except as a matter of sufferance. * * * It is argued that it never would do to require a steamboat or other vessel to stop or go out of the way in order to avoid a set net, or seine, because, if obliged to stop for one, they may be obliged to stop for a thousand, and there would be no getting along. But it is contended that the defendant had no right to come to the bank at the time and place he did, and is therefore bound to pay all damages that resulted from the fact of his doings so. Thus the question is, Had

the defendant a right to come to the bank at the time he did so, at the time and place he did? He says that by reason of the paramount right of navigation he had a right to come to the bank at any time and at any place there was a bona fide necessity for him to do so in the pursuit of his vocation; that in this particular instance, without any wantonness or malice, he did only so much as his business required him to do and took pains to avoid doing any unnecessary damage to the plaintiff. * * * But the gravamen of the plaintiff's (argument) is, that no skill or care could have brought the boat in without doing damage to the siene, and therefore it was, in contemplation of law, negligent and wrongful for the defendant to attempt to do it. So we come finally to the issue. Must a steamboat stop until a seine can be drawn out of the way, or has the boat a right to go to the bank at any time and at any place, when there is a bona fide necessity for doing so? * * * A boat on a navigable stream has a right to 'take her course' and go to the bank when and where it is necessary to do so, doing no unnecessary damage and acting without wantonness or malice."

It appears that the nets were run into at a distance estimated at about 900 feet from shore. An examination of the chart made from the government's survey shows that the steamer was in water of safe depth, and the weight of the testimony shows that it would have been dangerous for her to have gone further out into the Sound with her raft. The uncontradicted testimony also shows that Partridge is a man of good character and a prudent navigator and acquainted with the Albemarle Sound.

Applying these principles to the facts in this case, taken in their reasonable aspect, I am of the opinion that the steamer Armorica was within her right of navigation in passing from the mouth of Little river to Pasquotank river, and that for any injury sustained by libelant's nets the owner is not liable. Cases may be found in which the right of fishing in navigable waters is given larger protection against injury by those navigating, but it will be noted that, as in England, the several right of fishing is granted either by the crown or by the state. The rule laid down in Keeling's Case, supra, has been followed in this state. It is difficult to see how the relative rights of the public in navigation and fishing in navigable waters can be otherwise preserved. It is to be regretted that this case, involving so small an amount, should have involved such large costs, while within the admiralty jurisdiction it would seem that it should have been disposed of in the state court where the method of trial is much more simple and inexpensive. The material facts were simple and could have been easily established.

The libel must be dismissed, at the cost of the libelant.