## AGGER v. THE BEATRICE AND ROSE.
### No. 41.

United States District Court
D. Maine, S. D.
July 23, 1949.

Jacob Agger, Portland, Me., for libelant.

Mayo S. Levenson, Portland, Me., for Jacob Agger, trustee in bankruptcy.

Richard K. Gould, Winchester, Mass., for libelee and claimant.

CLIFFORD, District Judge.

This is a libel in admiralty originally brought by Carl Anderson to recover damages for the negligent destruction of certain gill nets. Subsequent to the incident upon which the libel is based, Anderson was adjudicated a bankrupt, and at the hearing of the case the trustee in bankruptcy was substituted without objection for Anderson as libellant on the record.

The allegations of the libel, as amended, relating to the material facts are as follows, omitting the allegation as to amount of damages:

First: The libellant is and at the time of collision was the sole owner of certain gill nets, so-called, and the libellant was engaged in fishing in a manner commonly known as "gill netting" at the time of the collision; the said gill nets, fourteen (14) in number, were set along the bottom of the ocean between two buoys, approximately one-half (½) mile apart, at a point six (6) miles south southeast of "Portland Light Ship", in a section of bottom known as "Trinidad".

Second: That on the eleventh day of March, 1947, at or about 7:30 A.M., the said vessel "Beatrice and Rose", traveling in a general northeasterly direction in Casco Bay, at the location mentioned above, and engaged in fishing commonly known as "dragging", deliberately, maliciously, and negligently went between the two buoys, as mentioned aforesaid, thereby going through and destroying thirteen (13) of the gill nets owned by the libellant.

Third: That due wholly to the negligent and careless operation of the said vessel and due to the utter recklessness and disregard by the officer in charge, the said thirteen (13) gill nets were destroyed and lost forever to the libellant.

Fourth: That the said nets were attached to two (2) bouys of a regular cork variety with a staff on each of said buoys at least ten (10) feet above the water, and with two (2) flags on each buoy, and that the said libellant had a right to have his nets laid in these waters, and was in the exercise of due care at all times, and that the said libellee would have been in no way endangered by avoiding the said gill nets since there was open water for many miles in any direction.

In answer, the claimant Frontiero denied all the material allegations of the libel.

The case came on for hearing in this court, at which time the following facts were uncontroverted and are found by this court to be true.

1. From March 8, 1947 until after March 11, 1947 libellant Carl Anderson was the owner and operator of the motor fishing vessel Dauntless, and the owner of a string of fourteen gill nets.

2. Each of libellant's gill nets was about three hundred feet long and six or seven feet wide, being weighted at intervals on one long edge and bearing aluminum floats at intervals on the other long edge, so that when the net was set in the water it rested on the bottom of the ocean and the floats held it in an upright position. Fish swimming through the nets became lodged when their gills were caught in the meshes. The nets could be joined end to end in a line, giving the effect of a single long net.

3. On March 8, 1947, Anderson set the fourteen gill nets in question in a line approximately north to south, along the bottom of the ocean in an area known to the fishing community as "Trinidad", located about six miles south southeast from Portland Lightship, off Casco Bay.

4. The depth of the water at the place where the nets were set was between thirty-seven and forty fathoms.

5. The string of nets in question was about half a mile in length and marked at either end by cork buoys.

6. The buoys marking the ends of the string of nets each carried a pole or mast about ten feet in height above the water, each pole displaying two flags about twelve inches square.

7. There were no other similar buoys in the immediate vicinity of libellant's buoys on March 11, 1947.

8. On March 11, 1947, claimant Gerome Frontiero was the owner and operator of the motor fishing vessel Beatrice and Rose.

9. The Beatrice and Rose on March 11, 1947 was equipped with a drag net, the drag consisting of two weighted "doors" towed by the vessel at the end of wire cables three hundred fathoms in length and a broad net attached at each end to one of the "doors". The doors are weighted so as to sink to the bottom and rigged so as to spread fifty feet or more apart when towed behind the vessel and hold the net open as it drags along the bottom.

10. At or about 7:30 on the morning of March 11, 1947 the Dauntless was in the vicinity of Trinidad, where the nets were located.

11. On that morning the Beatrice and Rose was dragging for fish in the vicinity of Trinidad.

Testimony as to the material events on the morning of March 11th is sharply conflicting.

Anderson stated that the day was hazy, but that visibility was good, and that he could see the Portland Lightship at all times from a distance of up to six miles

or more away. Frontiero stated that it was snowing, the visibility was poor, and that at times he could not see more than one mile. Neither party offered in evidence the weather records kept by the Lightship.

Anderson and Frontiero both testified that the Beatrice and Rose passed the Dauntless near the Lightship at about seven in the morning in daylight, as both vessels were headed for the Trinidad area. Anderson asserted that the Beatrice and Rose remained in sight thereafter; Frontiero, that he saw the Dauntless only a couple of times later that morning.

Anderson testified that he saw the Beatrice and Rose approach the area where his buoys were, turn and move off several miles, then turn again and head on a straight course for the buoys, passing between them. During the latter part of the run of the Beatrice and Rose up to and through the buoys, a matter of at least half an hour, Anderson's boat was stopped, less than ten minutes run from the nearest buoy. Anderson gave no signal and took no step at any time to warn the approaching vessel of the presence of the nets in her path. At the time the Beatrice and Rose passed through, Anderson stated that he saw the buoys tip and move together, indicating that the nets had been fouled. At all times Anderson could see both buoys plainly. He further stated that after the other vessel had gone through, he took his vessel up to the buoys and saw aluminum floats and bits of net floating in the water. He took up part of the buoy line and, finding that the nets had been pulled off, he pursued the Beatrice and Rose, attempted unsuccessfully to hail her from a distance of twenty-five yards or less, and returned to port after taking her name.

Frontiero, on the other hand, denied the truth of Anderson's version, and asserted that he had seen no buoys where he was operating and that at no time had he found any remnants of net on his drag when it was pulled in. He was able from memory and without notes after more than two years, to recall with apparent accuracy all changes of course and distances run

that morning, as evidence that his operations had been removed somewhat from the area where libellant's nets were located. Frontiero recalled that the Dauntless came along later in the morning and stopped some distance off, but states that the Dauntless made no hail. Thereafter, claimant testified that his drag fouled on the bottom, with resulting damage to his net.

As to the above evidence, this Court is forced to choose between the two conflicting versions. The court observed both witnesses carefully on the stand. Anderson impressed the court as being a man of little education, slow of wit and without imagination, but conscientious, frank and honest, and without any financial motive to falsify. Frontiero, on the other hand, appeared to the court as alert and keen of mind; but his general attitude and manner of answering questions, and in particular his positiveness as to small details of his testimony, impressed the court unfavorably. This court is of the opinion, therefore, that Anderson's version of the events of March 11, 1947 is the correct one.

 There was no evidence on the part of the claimant to show that a lookout was posted on his bow. The absence of such a lookout may well have been a contributing cause of the accident. The failure of claimant to give such evidence warrants the court in assuming that there was no lookout. 'Every doubt as to the performance of (this) duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary." The Ariadne, 1871, 13 Wall. 475, 479, 20 L.Ed. 542.

In the light of the foregoing, this court finds the following further facts:

12. Visibility in the vicinity of Trinidad at all significant times on the morning of March 11, 1947 was at least six miles.

13. The wind in the vicinity of Trinidad on the morning of March 11, 1947 was from the northeast at between five and ten miles an hour.

14. The masts and flags atop the two buoys which marked the ends of libellant's

gill nets were properly placed, and plainly visible on the morning of March 11, 1947, for a distance of at least two miles.

15. On the morning of March 11, 1947 claimant set the drag on the vessel Beatrice and Rose, at a point several miles southwesterly of libellant's buoys.

16. With drag set, claimant directed the course of the Beatrice and Rose northeasterly into the wind and toward libellant's buoys.

17. Claimant saw or should have seen the two buoys marking the ends of libellant's gill nets, from a sufficient distance to enable him to change the course of his vessel, the Beatrice and Rose, and avoid the nets.

18. There was no lookout posted on the bow of the Beatrice and Rose on the morning of March 11, 1947.

19. There was no circumstance or condition which would have rendered a change of course on the part of the Beatrice and Rose, to avoid the nets, either dangerous or prejudicial to her voyage.

20. Claimant maintained the northeasterly course of the Beatrice and Rose unchanged, and that vessel and its drag proceeded between libellant's buoys and over his gill nets.

21. During the last half hour of the run of the Beatrice and Rose approaching the buoys, the Dauntless, with libellant in charge, was stopped at a point less than ten minutes run from the nearer buoy, and libellant saw the Beatrice and Rose approaching; but libellant gave no warning signal, nor did he do anything else to attract the attention of the other vessel to the fact of the presence of his nets in her path.

22. Within a few minutes after the Beatrice and Rose passed between libellant's buoys, aluminum floats of the sort used in connection with libellant's gill nets were floating on the surface, with remnants of net, between the buoys.

23. Within a few minutes after the Beatrice and Rose passed through between libellant's buoys, the nets were substantially damaged.

24. The drag of the Beatrice and Rose passed over libellant's gill nets and gear, causing the aforesaid damage.

The parties have raised the question whether or not a greater than normal degree of negligence must be found before a vessel in the position of the Beatrice and Rose will be legally liable for damaging the nets of a fisherman, as in the present case. Claimant argues for a strict rule limiting liability in such a case to instances where the damage has been inflicted wantonly or deliberately. A strong dictum in The Armorica, D.C.E.D. N.C.1911, 189 F. 503, is authority for this strict position. In that case claimant's vessel hugged the shore as a safety measure in a gale, in so doing running through libellant's nets which were known to claimant to extend out two miles from shore. The court ruled that it would have been dangerous for claimant to have taken any other course.

The case of Lewis v. Keeling, 1854, 46 N.C. 299, 62 Am.Dec. 168, likewise states the strict rule. But in this case defendant's vessel, a river passenger boat, ran through plaintiff's nets in approaching the river bank to pick up a passenger; and the court found that there was a "bona fide necessity" for the boat to take that course. See Hopkins v. Norfolk & S. Railroad, 1902, 131 N.C. 463, 42 S.E. 902, where no such necessity was found and the granting of nonsuit was overturned. Cobb v. Bennett, 1874, 75 Pa. 326, 15 Am. Rep. 752, is another case stating a strict rule but which appears to be based on the exigencies of the particular situation.

A more moderate rule, and one which this court considers applicable to a broader class of situations, is inferable from the following cases. In the early case of Post v. Munn, 1818, 4 N.J.L. 61, 67, 7 Am. Dec. 570, the court stated, 4 N.J.L. on page 71, referring to the rights of navigation and fishing:

"Where one only can be enjoyed, that of navigation must be the one. Where both can be enjoyed, freely and fairly, that of navigation has no authority to trespass upon and injure the other."

In that case the court noted "strong evidence that the injury was done by design or neglect" on the part of the defendant and affirmed a verdict for plaintiff. The facts of the case would appear to come within either rule; what concerns us here is the fact that the court laid down a rule calling for ordinary care on the part of the vessel in a situation where both the rights of navigation and fishing could safely be enjoyed side by side.

In Wright v. Mulvaney, 1890, 78 Wis. 89, 46 N.W. 1045, 9 L.R.A. 807, 23 Am.St. Rep. 393, the facts were as follows: The jury found that plaintiff's fish pound was obviously marked and clearly visible, that defendant could have changed the course of his vessel and avoided the pound without prejudice to his voyage, and that he was negligent in failing to do so. The Court found no wantonness or malice, but expressly refused to apply the strict rule. On page 93 of 78 Wis., on page 1046 of 46 N.W., the Wisconsin court speaks as follows:

"We cannot doubt that the plaintiffs might lawfully fish in the waters of Green Bay as of common right, subject only to legislative control * * * The defendant might also lawfully navigate those waters with his steam-tug, and undoubtedly the right of navigation is paramount to that of fishing. But it does not necessarily result from this that the navigator may carelessly and negligently run his vessel upon the nets of fishermen and destroy them, and escape liability therefor, merely because he did not do so maliciously or wantonly. Such a proposition shocks any proper sense of justice. The benefit which the navigator is entitled to claim by reason of his paramount right is, we apprehend, that, when the two rights necessarily conflict the inferior must yield to the superior right. But he may not, by his own negligence, unnecessarily force the two rights into conflict, and then claim the benefit of the paramount right. Thus, he may run his vessel over a net in the night-time when he cannot see it, or in the day-time if he cannot avoid it, without interfering with the reasonable prosecution of his voyage, or be driven upon it by stress of weather, and not be liable therefor. But if he runs over the net in broad daylight in a calm sea, when, if he looks, he cannot fail to see it, and seeing, might easily and without prejudice to his voyage avoid it, the rule would be a strange one which would absolve him from liability because he merely failed to look and see the net and was not, therefore, actuated by malice or wantonness."

The rule in Wright v. Mulvaney has been approved in the cases of Bishop v. Baldwin, 1907, 147 Mich. 22, 110 N.W. 139, Horst v. Columbia Contract Co., 1918, 89 Or. 344, 174 P. 161 and Anderson v. Columbia Contract Co., 1919, 94 Or. 171, 184 P. 240, 185 P. 231, 7 A.L.R. 653, and is approved by this court.

### Conclusions of Law

■ 1. The master of the Beatrice and Rose acted negligently, carelessly, and in utter disregard of the rights of libellant, in maintaining the course of his vessel so as to pass through between buoys marking the ends of libellant's gill nets, at a time when the drag was set on the Beatrice and Rose, when he saw or should have seen the buoys, when he knew or should have known that the buoys marked the ends of gill nets, and when he could easily and safely have changed course to avoid the buoys and nets.

2. The master of the Beatrice and Rose acted negligently in failing to keep a lookout posted on the bow of his vessel, when a proper lookout would have given warning of the presence of libellant's buoys.

■ 3. Libellant exercised due care in setting and marking his nets.

■ 4. Libellant acted negligently in failing to give the Beatrice and Rose any signal or other warning of the presence of his nets, when he saw the Beatrice and Rose approaching the nets and was in a position to give a timely warning which might have prevented the damage.

■ 5. Libellant is entitled to a decree against the Beatrice and Rose and Gerome Frontiero for half his damages and interest, and for the usual order of reference, costs to be divided equally between the parties.